## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| SAMUEL CHANTILIS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. |
| vs. | COMPLAINT – CLASS ACTION |
| THE CHESAPEAKE LIFE INSURANCE COMPANY, HEALTHMARKETS, INC., MEGA LIFE AND HEALTH INSURANCE COMPANY, INGENIX, INC., | |
| Defendants. | |

Plaintiff, individually and on behalf of all others similarly situated, on information and belief, for his Complaint against Defendants states as follows:

### INTRODUCTION

1.      Plaintiff is a former insured and beneficiary of the Chesapeake Consumer Choice Plans, a group health plan offered by The Chesapeake Life Insurance Company which has not provided Plaintiff with the health insurance benefits to which he is contractually entitled.

2.      Specifically, Chesapeake and its affiliates under-reimbursed for healthcare services in violation of the terms of Plaintiff's contract of insurance and in violation of the Employee Retirement Income Security Act.  These under-reimbursements were accomplished through utilization of a defectively designed and defectively maintained database created and sold by Defendant Ingenix and its affiliates.

3.      In this putative class action, Plaintiff seeks reimbursement for his unpaid benefits, as well as other appropriate declaratory, equitable and legal relief to remedy Defendants' breaches of the terms of their contractual obligations, breaches of various ERISA procedural requirements, and breaches of fiduciary duties owed to Plaintiff and the Class.

## THE PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Dr. Samuel J. Chantilis is a citizen and resident of the United States of America, State of Texas, County of Dallas.  During the relevant time period, Dr. Chantilis has been a member of a health plan fully insured by Defendant Chesapeake and sponsored by his employer, Dallas-Fort Worth Fertility Associates.

5.      This plan provided health insurance benefits for Dr. Chantilis and members of his family.

6.      Members of the proposed plaintiff classes and alternative sub-classes include citizens of States diverse to the citizenship of Defendants.

7.      All references to "Plaintiff(s)" throughout this Complaint are made on behalf of the named Plaintiff and the Class, and vice versa.

8.      The Chesapeake Life Insurance Company is a subsidiary of HealthMarkets, Inc. and offers a variety of health insurance plans marketed under the HealthMarkets brand.  The Chesapeake Life Insurance Company is domiciled in Oklahoma and is licensed to sell health insurance plans in all states except New Jersey, New York, and Vermont. Chesapeake Life Insurance Company's headquarters and principal executive offices are located at 9151 Boulevard 26, North Richland Hills, Texas 76180.  The Chesapeake Life Insurance Company may be served with process by service on its registered agent Brenda Johnson, 9151 Grapevine Hwy., North Richland Hills, Texas 76180-5605.

9.      Defendant MEGA Life and Health Insurance Company has its headquarters at 9151 Boulevard 26, North Richland Hills, Texas 76180. It is licensed in all states except New Jersey to sell insurance. MEGA Life and Health Insurance Company may be served with process by service on its registered agent Brenda Johnson, 9151 Grapevine Hwy., North Richland Hills, Texas 76180-5605.

10.     Defendant HealthMarkets, Inc. has its corporate headquarters at 9151 Boulevard 26, North Richland Hills, Texas 76180. HealthMarkets, Inc. may be served with process by service on its registered agent CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

11.     HealthMarkets is the brand name for health insurance plans underwritten by The Chesapeake Life Insurance Company, The MEGA Life and Health Insurance Company and Mid-West National Life Insurance Company of Tennessee. Defendants Chesapeake Life Insurance Company, MEGA Life and Health Insurance Company and Health Markets, Inc. are collectively referred to herein as "Chesapeake."

12.     Defendant Ingenix, Inc. is a wholly-owned subsidiary of United Health Group, one of the largest health insurance companies in the United States. It is a global health care information and technology provider with offices in more than 40 countries. Ingenix has its main corporate headquarters at 12125 Technology Drive, Eden Prairie, Minnesota 55344. Ingenix, Inc. may be served with process by service on its registered agent CT Corporation System, 350 North St. Paul Street, Dallas, TX 75201.

13.     Whenever it is stated in this Complaint that any of the Defendants did any act with respect to the Plaintiff or the Class, the statement is meant to include any and all representatives, agents, employees or other persons acting on behalf of The Chesapeake Life

Insurance Company, HealthMarkets Inc., MEGA Life and Health Insurance Company, and Ingenix, Inc., whether acting through authority, apparent authority or otherwise. Each of The Chesapeake Life Insurance Company, HealthMarkets Inc., MEGA Life and Health Insurance Company are either formally named as an administrator and fiduciary in the plan instruments or had authority to exercise discretionary control over plan management or plan assets and actually controlled the distribution of funds and decided whether or not to grant benefits. As a result, each of The Chesapeake Life Insurance Company, HealthMarkets Inc., MEGA Life and Health Insurance Company are liable for any injury suffered by the Plaintiff and the Plaintiff Class. Defendant Ingenix, Inc. is a functional fiduciary by virtue of the fact it exercises discretionary authority and control respecting plan management or assets through its creation and sale of PHCS data which substantially determine plan reimbursements.

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331, in that the claims asserted herein arise under federal law. Specifically, the rights and duties of insurance companies and beneficiaries of employer sponsored health care plans are governed by the Employee Retirement Insurance Security Act of 1974 ("ERISA") § 502, 29 U.S.C. § 1132.

15.    This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from one or more of the defendants and seeks in the aggregate more than $5,000,000, exclusive of costs and interest.

16.    Venue in the Northern District of Texas is proper under §502(e)(2) and §502(f) of ERISA, 29 U.S.C. §1132(e)(2) and §1132(f) because it is the district in which the Plan is

administered, the district in which all Defendants reside, the district where the alleged breaches took place, and the district in which the Plaintiff resides.

17.     This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and the Defendants systematically and continuously conduct business in this State, and otherwise have minimum contacts with this State such that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

## STATEMENT OF FACTS

18.     In July, 2006, Dr. Samuel J. Chantilis renewed his group medical insurance coverage ("Policy") with Chesapeake Consumer Choice Plans.  The Policy was underwritten by The Chesapeake Life Insurance Company (a subsidiary of HealthMarkets, Inc.).

19.     Plaintiff's Policy promised that it would limit Plaintiff's exposure for covered medical expenses to "any difference between the Requested Charge and Maximum Allowable Charge authorized by Us, as well as any Coinsurance Percentage."   Certificate of Group Insurance p. 19 (July 1, 2006).

20.     "Requested Charges" was defined by the policy as the charge the Provider requests for service.

21.     The Coinsurance for Plaintiff's Policy was set at "20% of the Maximum Allowable Charges."

22.     The Maximum Allowable Charge ("MAC") was defined on page 7 of the Certificate to represent the prevailing charge for treatment in the applicable geographic area:

> MAXIMUM ALLOWABLE CHARGE(S): The charge billed by the Provider, but not more than the amount determined by Us based on available data resources of competitive fees and the nationally recognized medical database We use for this purpose. That database shows the representative charges for the treatment, service or supply in the geographic cost area where the Insured

resides or the geographic cost area where the employer is located if the Insured resides outside the areas where We are actively marketing health insurance.

23. The database used by Chesapeake to determine the MAC was the Prevailing Health Charges System ("PHCS"), a database owned and operated by Ingenix, Inc.

24. The PHCS is purportedly designed to collect and report actual charge data by providers for health care services, from which MAC rates can be determined by Chesapeake. PHCS also includes derived charges for procedures with insufficient charge data.

25. This database is inherently flawed and invalid, and is an inadequate and improper basis for MAC determinations. The flaws and errors in the PHCS caused and/or allowed Chesapeake to calculate artificially low MACs and thus systematically under-reimburse its policyholders for covered charges.

26. The use of the PHCS by Ingenix, Inc. and health insurers was the subject of an extensive investigation by the New York Attorney General ("NYAG"). As a result of the investigation, the New York Attorney General reported:

> Insurers mislead and obfuscate in their policy language. They promise to reimburse based on usual and customary rates – a form of market rate – but then reimburse based on schedules compiled by one of their own, the nation's second largest health insurer, which has an interest in depressing reimbursement rates. They hide this conflict of interest from their members. They pretend an independent database underlies these rates – it does not. Our investigation found that the Ingenix schedules themselves, created in a well of conflicts, are unreliable, inadequate, and wrong – usually at the expense of the consumer.

27. The NYAG found that the PHCS "is fraudulent. The industry uses a conflict-laden database riddled with errors at the expense of the consumer. The database is neither independent nor fair. This leads to chronically flawed decisions."

28.    The New York Attorney General further reported that its investigation had determined "that for ordinary doctor's office visits, the Ingenix database understate[s] market rate[s] by up to 28 percent [for the market under investigation] across the state."

29.    Beginning in 1973, the Health Insurance Association of American ("HIAA"), an association of health insurance companies, created PCHS to pool certain nationwide historical charge data for surgical and anesthesia procedures obtained from numerous data contributors, including insurance companies, third-party payors, and self-insured companies. HIAA later expanded PHCS to include data regarding dental (1977), medical (1988) and drugs/medical equipment (1998).

30.    The database was not designed to determine reimbursement amounts and does not provide an accurate basis for doing so. Instead it was designed to provide limited information about provider charges based on the limited information collected by HIAA.

31.    Through HIAA, health insurers reached agreements relating to the substantive development, design and management of the database.

32.    The HIAA and its insurance company members decided that data contributors would only need to submit four pieces of information per claim to be included in the database: date of service; a five-digit Current Procedural Terminology ("CPT") code that only partially describes the service(s) and procedure(s) provided; the provider's billed charge; and the first three digits of the zip code where service was provided.

33.    HIAA and its insurance company members agreed not to require the submission of more detailed information about the medical service, or any information about the provider of the service, even though such information is necessary for a properly functioning database used for reimbursement determinations.

34.     In internal documents, HIAA acknowledged that the database's source data were too limited and the quality of certain data was questionable.

35.     Despite the fact that the database did not capture sufficient information to provide anything remotely close to an accurate determination of prevailing charges, HIAA, acting in its shared interest with its health insurer members, promoted the database as a comprehensive and reliable tool for determining reimbursement rates.

36.     By advisory opinion dated July 31, 1996, the United States Department of Labor ("DOL") opined that schedules reflecting determinations for standard (or representative) provider charges had to be disclosed to ERISA plan subscribers, instructing: "[S]chedules ... that contain information...relating to standard charges for specific medical or surgical procedures, that, in turn, serve as the basis for determining or calculating a participant or beneficiary's benefit entitlements ... would constitute 'instruments under which the plan is ... operated.' Thus, ...the schedule of 'usual and customary' fees [for representative charges]... would be required to be disclosed to participants and beneficiaries." (DOL Opinion Letter, No. 96-14A (July 31, 1996)).

37.     HIAA continued to fail to disclose the information found in the databases and ignore the DOL, and to advise users not to comply with DOL Opinion Letter No. 96-14A even after the DOL announced in 1996 its statutory interpretation that disclosure was required by all insurance companies that used such data to determine usual and customary rates.

38.     HIAA, Chesapeake, and other health insurers were aware that the information in the database was not designed to, and could not accurately provide data regarding representative charges for medical services, treatment, and supplies for a geographic region.   Despite this knowledge, Chesapeake and other health insurers continued to use the database for this purpose.

39.     Despite knowing that the database did not provide accurate and representative charge data, HIAA and its health insurer members – in order to reduce competition among themselves – agreed to continue to use the database to make these determinations.  Because of the unreliable and fraudulent nature of the database, this was in direct violation of their contractual and fiduciary obligations to their respective subscribers to provide reimbursement for the lower of the Contracted Rate and the Maximum Allowable Charge for health services.  The insurers also agreed to refuse to disclose information regarding the database that would allow insureds to understand and challenge reimbursement decisions.  HIAA and its health insurer members agreed to refrain from requiring the submission of more detailed information from data contributors (including themselves) because the lack of specific information enabled the database to combine lower cost services (such as those provided by inexperienced physicians and non-physician healthcare providers) with higher cost services (such as those provided by experienced physicians) resulting in overall reductions in reimbursement levels for insurers.

40.     In conformance with this agreement, Chesapeake continued to use the database as a primary source for its MAC rate determinations, even though it knew that it was inadequate for this purpose and thus systematically underpaid health benefits to its subscribers.

41.     In October 1998, the HIAA allowed the wholly-owned subsidiary (Ingenix) of one of the largest health insurers in the country, UnitedHealth, to acquire PHCS (even though it already owned the major competing product, the MDR database).  Since 1998, Ingenix has continued to market PHCS and MDR as separate product lines, although it appears that these two databases were consolidated in 2001.  Since these acquisitions, the insurance industry, including Chesapeake, has overwhelming relied on the Ingenix "data benchmarking" products to estimate reimbursements.

42.     As a condition to closing under the purchase agreement between HIAA and Ingenix, Ingenix agreed to enter into a so-called "Cooperation Agreement" with HIAA that had a term of ten years.

43.     The Cooperation Agreement gave HIAA and its health insurer members continued power relating to the development and operation of the database despite its acquisition by UnitedHealth's subsidiary.  These included the following:

    a. HIAA and Ingenix would create a committee, called a "Liaison Committee," on which they each had to have at least two representatives;

    b. The Liaison Committee was to meet "as necessary, but in no event less than twice a year," for the "purpose of discussing, evaluating, recommending and providing market insight relative to (i) Ingenix's management of the Products [i.e., the Ingenix Databases], and (ii) maintaining or improving the availability, quality, usefulness and consistency of the Products";

    c. Ingenix would "give due consideration to the views of HIAA's representatives on the Liaison Committee";

    d. Ingenix would "maintain the consistency of the input and output formats" of the database's core products, the Medical, Dental and Surgical Fee Schedule Databases (the "Core Products"), until December 31, 2000, after which the Liaison Committee "will have the opportunity to provide input to Ingenix on Product enhancements or replacements, including any changes to input formats";

e.  Ingenix may "price and revise prices for the Core Products" only in accordance with the Cooperation Agreement;

f.  Ingenix would charge HIAA members 50% less than non-HIAA members for all Core Products;

g.  Ingenix would waive all fees for current HIAA members that continue to contribute data at the same level of contribution that they were then contributing; and

h.  Ingenix, except in limited cases, would not increase the prices of the Core Products by more than 10% per year for the subscribers of any 1998 product.

44.    The Cooperation Agreement also required that UnitedHealth's subsidiary, Ingenix, take "all commercially reasonable measures so that no claims-paying organization nor any customer or user of such products can identify any of the data as having been contributed by the organization that submitted it." As a direct result, no provider or beneficiary can determine whether a particular provider's data has been included in the database. In addition, as part of the Asset Purchase Agreement for the database, United Healthcare agreed to become a member of HIAA.

45.    Health insurers agreed to provide selected billing data for use in the database. As described below, this data is not representative of the actual charges for health care services within a geographic area but, instead, systematically and substantially understates those charges. Chesapeake and other insurers have repeatedly been put on notice that this data is not an adequate basis for determining representative charges. Nevertheless, Chesapeake and other

health insurers receive back schedules based on the pooled data which is then used by the insurers to set their reimbursement rates for medical services.

46.     After investigating the practices of Ingenix and the health insurers that use its database, the New York Attorney General concluded that "for ordinary doctor's office visits, the Ingenix databases understate market rate[s] by up to 28 percent across the state." The NYAG determined that "the Ingenix schedules themselves, created in a well of conflicts, are unreliable, inadequate, and wrong" and concluded that use of the database by health insurers was "fraudulent."

47.     In the spring of 2009, the United States Congress undertook an investigation into the use of Ingenix's databases in setting reimbursement amounts. The Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Pay For?" The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for health care services. The statements and archived webcast are available at http://commerce.senate.gov/public/index.cfm?FuseAction=Hearings.Hearing&Hearing_I D=63b0f558-ec43-4ab8-82f0-070bcc699e38.

48.     At the March 31, 2009 hearing, Senator and Committee Chairman John D. Rockefeller, IV – speaking for the majority of the Senate Committee – explained why they believed the insurance industry's practices were "deceptive." Mr. Rockefeller noted:

> The insurance industry promised to base their…payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area. Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

Senate Committee on Commerce, Science, and Transportation, "Deceptive Health Insurance Industry Practices -- Are Consumers Getting What They Paid For?," March 31, 2009.

49.     Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of Ingenix's databases to pay far less than the prevailing amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Mr. Slavitt's company, Ingenix.

Senate Committee on Commerce, Science, and Transportation, "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?," March 31, 2009.

50.     On June 24, 2009, the Office of Oversight and Investigations of the United States Senate Committee On Commerce, Science And Transportation issued a report entitled *Underpayments To Consumers By The Health Insurance Industry*.  That report states that the committee:

> ha[s] determined that in every region of the United States, large health insurance companies have been using two faulty database products owned by Ingenix, Inc. to under-pay millions of valid health insurance claims.  The companies have used these Ingenix database products without providing even the most basic information about them to consumers or health care providers.

Report at i.

51.     Chesapeake and other health insurers are provided with uniform pricing schedules twice a year by Ingenix.  The insurers load the fee schedule data received from Ingenix into

computer systems for access by claims processors to determine subscriber reimbursement. Chesapeake uses these schedules "as a benchmark to set their reimbursement rates."

52.     Following treatment of a Chesapeake plan member, the bill for the provider's services is sent to Chesapeake for payment.  The bill typically identifies the specific service performed with a five-digit CPT procedure code.  CPT procedure codes can be used by any health care provider to bill for services regardless of licensure, specialty training, or experience.

53.     Chesapeake's claims handlers enter certain information from the claim and access the database Chesapeake uses to determine the MAC.  Chesapeake then uses this dollar amount (or less) as the basis for determining the MAC dollar amount for the service.  As in Plaintiff's case, the MAC is frequently significantly less than the contracted rate with the Provider (and therefore less than the Requested Charge).

54.     Chesapeake knows that this data is not accurate for purposes of determining MAC and, in fact, knows that this data has a significant downward bias that will result in under-reimbursement of its insureds.

55.     To create the database, Ingenix collects data from "Data Contributors," consisting primarily of charge data provided by health insurers.  Both the nature of the data provided by health insurers and the manner in which that data is analyzed and compiled, results in inaccurate and downwardly-biased information about provider charges.  As a result, the schedules created by Ingenix (and used by Chesapeake and other health insurers) are – as the New York Attorney General has determined – "unreliable, inadequate and wrong."

56.     For example, prior to providing data to Ingenix, health insurer contributors "scrub" the data to remove many high charges.

57. Moreover, the information provided for use in the database relies on too few data points for each medical procedure. The database relies on just four pieces of data for each submitted charged: date of service; 5-digit CPT code; the address where the procedure was performed; and the amount of the provider's billed charges. These data points are the sum total of the information that purportedly will be used by the health insurer to compare similarly situated procedures.

58. Because it only collects the four aforementioned data points for each reported charge, the Ingenix Databases do not, and cannot, determine from the reported data (i) the number of physicians or other providers in a given geographic area; (ii) whether the data reflects physician or non-physicians billed charges; (iii) the number or percentage of providers furnishing billed charge data; (iv) any provider's usual charge; (v) any provider's licensure, specialty training, or experience; (vi) the degree of skill needed for the service; (vii) the patient's age or health status for a specific reported charge; (viii) the complexity of the treatment for a specific patient for a specific reported charge; (ix) the point of service ("POS") (such as the name of the hospital, clinic, physician's office, nursing home, etc.) for a reported charge; (x) the range of services or products otherwise provided by the facility; (xi) rates for services or products based on the cost of providing the same or similar service or product; or (xii) the prevailing rate for any provider or service in a particular geographic area.

59. Thus, if a patient uses a highly skilled Board Certified specialist, the database improperly assumes that the service should cost the same as that provided by a general practitioner. Any database that was designed or intended to be accurate would take into account such basic differences.

60.     After data is received by Ingenix, it is "scrubbed" again to remove certain charges. The "scrubbing" methods used by Ingenix again have the effect of removing "high fees" and creating a downward bias in the database.

61.     Some of the actual charge data is submitted by data contributors with a "modifier." A modifier is a two-digit number added to the CPT Code that identifies the service. For example, modifiers may be used because of the complexity or severity of the condition treated with respect to the service provided. Ingenix edits out almost all actual charges submitted with a modifier, which again creates a downward bias in the database.

62.     These downward biases in the database created with the help of insurers, and then used by Chesapeake and other insurers, result not only in inaccurate information, but also significant under-reimbursement of health care expenses. The New York Attorney General report on the biases created by use of the Ingenix database concluded that by relying on this "rigged" and "fraudulent" database, insurers systematically under-reimburse" insureds for doctors' office visits.

63.     For a brief period, Ingenix and HIAA received expanded data from some providers but, notwithstanding the knowledge of Ingenix, HIAA and health insurers that such data was required to address biases and inadequacies in the database, continued to use only the four data points described above. Chesapeake knew or should have known that the expanded data was not included in the Ingenix database, but continued to use the flawed and biased database to determine MAC rates.

64.     Despite its knowledge of these problems (and knowledge of other participants in this scheme, including Chesapeake), Ingenix does not audit the data contributions or verify the accuracy, completeness or representativeness of data submitted by contributors.

65.     For the vast majority of CPT codes, the database also uses "derived" data rather than actual data. Ingenix derives data for approximately 90% of CPT codes that have fewer than nine actual charges and uses a conversion factor to estimate charges.  This conversion factor is also calculated in a manner that is designed to lead to underestimation of actual charges and lead to under-reimbursement for medical services payments.

66.     Moreover, the database computations used for both actual charge data and derived data do not compile the database on specific geographic areas, but instead combine three-digit zip codes called "geozips."   These geozips were not designed for this purpose (they were designed for delivery of mail) and do not provide a reasonable or accurate basis to make cost comparisons among different patterns.

67.     After completing its yearlong investigation of the preparation and use of this database by health insurers, the New York Attorney General determined that this is a "rigged system."  The Attorney General's Report found that the "model" implemented and used is "riddled with errors at the expense of the consumer" and is "chronically flawed" and "fraudulent."

68.     The downward biases in the database used by Chesapeake mean that the database is not only inaccurate, it is systematically biased to result in significant underpayment of insurance benefits.

69.     Plaintiff is a Chesapeake insured who has paid for health insurance of a specific quality and level of coverage.

70.     As a result of Chesapeake's use of PHCS, Chesapeake has failed to provide the health insurance coverage promised to Plaintiff.

71.     Plaintiff has been forced to incur significantly higher out-of-pocket health care charges as a result of Chesapeake's use of PHCS and resultant miscalculation of the prevailing charge for treatment.

72.     On August 18, 2007, Dr. Chantilis's wife Cheryl Chantilis gave birth to Plaintiff's son by cesarean section at Presbyterian Hospital of Dallas.  Presbyterian Hospital of Dallas billed a total of $3,627.25 to Chesapeake Life Insurance Company for the delivery.

73.     The Presbyterian Hospital of Dallas bill stated the "contracted account" as $2,539.08.

74.     Chesapeake's website states, "If you use a contracted facility, like the one listed above [Presbyterian Hospital of Dallas], you will receive the contracted rate."

75.     Chesapeake – rather than paying the contracted rate, and rather than paying $2,031.31, which would have represented 80% of the contracted rate – calculated the MAC as $1,156.50 and paid only $925.20.  As a result of Chesapeake's calculation of the MAC, Plaintiff was under-reimbursed in the amount of $1,106.11.

76.     With respect to the aforesaid health services from Presbyterian Hospital, Chesapeake sent Dr. Chantilis an EOB that was uninformative, false and misleading.

77.     Chesapeake's website allows insureds to compare the relative cost for specific medical procedures by geographic area.  A green dot indicates a low cost to the consumer – meaning that the rate charged by the provider will not be significantly higher than the "MAC" amount or "contracted rate" amount that Chesapeake utilizes to calculate reimbursements.  A yellow dot indicates that the cost to the consumer over and above the MAC amount will be moderate.  A red dot indicates that the cost to the consumer will be high, meaning that the rate charged by the provider will be significantly higher than the "MAC" amount or "contracted rate"

amount that Chesapeake utilizes to calculate reimbursements. A cursory review of this website confirmed that Chesapeake's calculation of the MAC for the birth of Plaintiff's son is not representative of the prevailing charge for birth by cesarean section in the Dallas area. Specifically, a search of hospitals in the Dallas area revealed that out of the forty-four facilities in the "Dallas geographic area," twenty-eight of the facilities are designated as yellow or red for cesarean section, while only sixteen facilities are designated as green for cesarean section.

## ALLEGATIONS COMMON TO ALL COUNTS

78.     Chesapeake issues, insures and administers health insurance plans such as the one through which Plaintiff receives his insurance. Many of these are group health plans offered through participants' employers and administered by Chesapeake.

79.     With respect to all of its health care plans, Chesapeake is obligated to its plan members to provide specific health care benefits and reimbursements.

80.     As such, Chesapeake is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") and its attendant regulations.

81.     Chesapeake is also an ERISA fiduciary for the ERISA health plans at issue. As such, Chesapeake owes its plan members the fiduciary duties of care and loyalty, and it must apply its plan provisions in good faith.

82.     Chesapeake's role in administering employee benefit plans, which included but was not limited to setting reimbursement rates, making other coverage and benefit decisions, and deciding appeals, made Chesapeake a fiduciary to class members under ERISA.

83.     Chesapeake breached its fiduciary duties under ERISA by using the Ingenix Database to make MAC determinations even though Chesapeake does not have access to the underlying data or methodology used to create those databases, has no ability to review, evaluate

or determine their validity for the purpose of making MAC determinations, and has not made such review or evaluations.

84. As such, Chesapeake improperly delegated its responsibility to ensure accurate reimbursement, failed to pay benefits, failed to provide a full and fair review of claims, failed to provide accurate materials fairly summarizing its plans and explaining adverse benefit determinations, and breached its fiduciary duties, all in violation of ERISA.

85. Under ERISA, Chesapeake is required, among other things, to comply with the terms and conditions of its health care plans; to afford plan members an opportunity to obtain a "full and fair review" of any denied or reduced reimbursements; and to make certain disclosures to plan members, such as accurately setting forth plan terms; explaining the specific reasons why a claim is denied and the internal rules and evidence that underlie such determinations; disclosing the basis for its interpretation of plan terms; and providing appropriate data and documentation concerning its coverage decisions.

86. The federal common law of trusts, which is applicable to ERISA fiduciaries such as Chesapeake, furthers requires that fiduciaries deal honestly with plan members and adhere to certain specific fiduciary standards in their dealings.

87. In offering and administering its health care plans, Chesapeake assumes the role of "Plan Administrator," as that term is defined under ERISA, in that it interprets and applies the plan terms, makes all coverage decisions, and provides for payment to plan members and/or their providers. As the Plan Administrator, Chesapeake also assumes various obligations specified under ERISA. These obligations include providing its plan members with a "summary plan description" (SPD), a document designed to describe in layperson's language the material terms,

conditions and limitations of the health care plan.   The full details of the plan, which are summarized in the SPD, are contained in the Evidences of Coverage (EOC).

88.     Chesapeake is obligated under ERISA to make its coverage determinations in a manner consistent with the disclosures contained in the SPD.   To the extent there is a disparity or conflict between the SPD and the EOC, the SPD governs, so long as the plan member benefits from the application of the SPD.   If the employer, rather than Chesapeake, is deemed to be the Plan Administrator, Chesapeake remains responsible for ensuring that the SPD complies with the law under its duties as a co-fiduciary as provided in ERISA, 29 U.S.C. § 1105, even if the employer prepares or disseminates the SPD.

89.     Chesapeake breached its fiduciary duties by failing to disclose the reimbursement rules it uses to reduce plan members' benefits, by knowingly and/or recklessly using inaccurate, flawed, and/or outdated data from the Ingenix databases to calculate Maximum Allowable Charges, by knowingly and/or recklessly delegating its duty to collect accurate information regarding MACs to Ingenix (whom Chesapeake knew or should have known was relying upon flawed data), and by failing to fulfill its obligations of good faith, due care, and loyalty.

90.     By relying on data that systematically results in under-reimbursement to consumers when the calculated MAC is less than the contracted rate, Chesapeake deprives its insureds of benefits it has agreed to pay.   Chesapeake is defrauding them, by refusing to pay promised benefits, when the MAC is determined to be lower than the contracted rate with facilities.   Chesapeake is using a rigged system to reduce their reimbursement obligations.

91.     All notice requirements and conditions precedent to litigation have been satisfied. Alternatively, exhaustion of any administrative remedy is unnecessary and/or is futile and/or has

been waived and/or has been fully completed, and the filing of this lawsuit will satisfy all notice requirements and conditions precedent imposed by law.

92.      Plaintiff did not discover or have actual knowledge of Defendant's breaches or violations until recently.   Defendants concealed their scheme to breach their fiduciary duties. Defendants' actions constituted "fraud" and "concealment" as defined by 29 U.S.C. §1113, and the six year statute of limitations is applicable to Plaintiffs' breach of fiduciary duty causes of action.  More specifically:

> a.  Each and every Defendant had a duty under ERISA not to make any material misrepresentations to the Class members, as well as a duty to disseminate complete and truthful information – including material facts regarding the benefits – to the Class members;
>
> b.  As fiduciaries of the Plans, the Fiduciary Defendants had a duty under ERISA not to make any omissions of material facts when communicating with Class members;
>
> c.  Defendants breached their duty by making a known misrepresentation or omission of a material fact to induce the Plaintiffs and class members to act to their detriment by omitting the true material facts regarding the database.
>
> d.  By including the language in the plans that the Maximum Allowable Charge reflects the representative charges in the relevant geographic cost area, the Defendants were attempting to induce Plaintiff and the class to create the illusion that such reimbursement rates were properly calculated; and

    e.  Defendants "engaged in acts to hinder the discovery of this breach of

fiduciary duty" by disseminating misleading SPDs and EOBs.

93.     Plaintiff seeks reimbursement of a portion of the insurance premium and for

unpaid amounts caused by Chesapeake's unlawful conduct, declaratory and injunctive relief, and

all other appropriate relief to prevent these violations of law and fully compensate Plaintiff and

other members of the class.

## CLASS ACTION ALLEGATIONS

94.     This action is brought as a class action by the Named Class Representative

Plaintiff on behalf of himself and a similarly situated class of beneficiaries pursuant to Rule

23(a) and 23(b)(1), (2), and (3) of the Federal Rules of Civil Procedure.  The proposed class is

defined as follows:

> All persons in the United States who are, or were, within six years
> of the filing of this complaint through the date set by the Court as
> the outside class date, ("class period") members in group
> Healthcare plans insured or administered by Chesapeake subject to
> ERISA who received medical services (including hospital,
> ambulance, physician, mental health, pharmaceutical, or any other
> type of medical services or supplies) for which Chesapeake (or
> anyone acting on behalf of Chesapeake) allowed less than the
> provider's billed charge.

95.     The Named Class Representative Plaintiff brings ERISA claims against the

Defendants on his own behalf and on behalf of the Class for the following: to recover benefits

due Class members under the plan, and to enforce and clarify their rights under ERISA §

502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); to remedy Defendants' failure to accurately disclose

information in plan materials and otherwise, and Defendants' failure to provide a "full and fair

review" of the decisions denying claims under ERISA § 503, 29 U.S.C. § 1133.

96.     The Plaintiff alleges that the Fiduciary Defendants are fiduciaries which have

violated their fiduciary duties of loyalty and care under ERISA §§ 404(a)(1)(B) and (D), and

406, by relying, *inter alia*, on databases that are invalid for the purpose of determining reimbursement under the MAC by systematically reducing reimbursement without disclosure, contractual authority, or authorization under the Summary Plan Description and by failing to provide required data and other information to Plaintiff and Class Members.

97.    The Plaintiff further alleges that Defendants have violated federal claims procedures. *See*, e.g., 29 C.F.R. § 2560.503-1.

98.    Finally, the Plaintiff alleges that Defendants acted – and continue to act – as an adversary, not as a fiduciary, to their beneficiaries, the Class Members.

99.    The members of the class are so numerous that joinder of all members is impracticable.  Although information about the precise number of members in the Class is within Chesapeake's possession, custody and control, upon information and belief, the Class consists of thousands of employees and their dependents who are participants and beneficiaries in group health plans insured, offered or administered by Defendants.   The precise number of class members is within Defendants' custody and control.   Based on reasonable estimates, the numerosity requirement of Rule 23 is easily satisfied for the Class.

100.    Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class.  These include:

> a.   Whether Chesapeake's use of the Ingenix Databases to calculate MACs in determining reimbursement breached Chesapeake's legal obligations to its plan members in group health plans;
>
> b.   Whether Chesapeake systematically and typically made ABDs ("adverse benefits decisions") reducing reimbursement contrary to beneficiaries'

Evidences of Coverage ("EOC") and Summary Plan Descriptions ("SPDs");

c.  Whether ERISA requires each Class Member to prove exhaustion or other legal reasons excusing exhaustion;

d.  Whether Chesapeake's alleged fiduciary violations, if proved, justify injunctive or other relief;

e.  Whether Class Members (including those who assigned claims) may recover a portion of their insurance premiums as well as unpaid benefits and if so, the amount they should receive;

f.  Whether Chesapeake's failure to provide accurate plan documents, including EOCs and SPDs and other information upon request entitles Class Members to any relief;

g.  Whether, in addition to unpaid benefits, interest should be added to the payment of unpaid benefits under ERISA;

h.  Whether Chesapeake's claims review procedures comply with ERISA;

i.  Whether Chesapeake's communications with its plan members violated ERISA;

j.  Whether Chesapeake's SPDs comply with ERISA; and

k.  The applicable statute of limitations periods for the claims of Class Members.

101.  The named Plaintiff's claims are typical of the claims of Class Members because Chesapeake has breached its contractual and statutory obligations to the named Plaintiff and

Class through the practices described above.  The named Plaintiff is a member of the Class described herein.

102.    Plaintiff will fairly and adequately protect the interests of Class Members, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action litigation and in the prosecution of ERISA claims, and has no interest antagonistic to or in conflict with those of the Class.  For these reasons, the named Plaintiff is an adequate class representative.

103.    The prosecution of separate actions in this matter would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendants as to the Class.

104.    The Defendants have acted in a manner that applies generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

105.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable.  Moreover, because of the amount of insurance premiums wrongfully retained and unpaid benefits owed to class members relative to the expense and burden of proceeding with litigation against these defendants, individual actions are not a practical method to redress the unlawful conduct challenged herein.  Given the uniform policy and practices at issue, these will also be no difficulty in the management of this litigation as a class action.

### Count I
### Enforcement of Contractual Obligations and Claim For Unpaid Benefits Pursuant to ERISA 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

106.    Plaintiff repeats and incorporates herein the allegations in each of the preceding paragraphs.

107.   Chesapeake is legally obligated to pay benefits to beneficiaries of plans insured, funded or administered by Chesapeake pursuant to the terms of its ERISA plans.

108.   Because of the deficiencies of the databases identified herein, each and every time Chesapeake calculated the MAC using defective data, Chesapeake violated Plaintiff's EOCs and SPDs, and breached the beneficiaries' contracts of insurance, all of which explicitly or by operation of law prohibit the use of defective data to calculate the MAC.

109.   In addition, Chesapeake has violated its obligations under ERISA, federal regulations and federal common law by making reimbursement decisions in a manner that violates the terms of the plans and is calculated to fail to provide reimbursement of the representative rate for similar services within the relevant geographic region.

110.   Plaintiff and the Class are entitled to monetary damages and/or restitution from Chesapeake, as well as other declaratory and injunctive relief related to enforcement of the plan terms, and to clarify future benefits.  In particular, Chesapeake is liable to Plaintiff and the Class for unpaid benefits, recalculated deductible and coinsurance amounts, interest, attorneys' fees, and other penalties as this Court deems just, under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  In addition, Plaintiff and the Class seek counsel fees, costs, prejudgment interest and other appropriate relief, including the issuance of appropriate declaratory and injunctive relief against Chesapeake and its removal as fiduciary, for its violations of ERISA.

## Count II
### Violation Of Fiduciary Duties Of Loyalty And Due Care Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)

111.   Plaintiff repeats and incorporates herein the allegations in each of the preceding paragraphs.

112.   During the relevant time period, the Defendants acted as "fiduciaries" to Plaintiff and the Class in connection with beneficiaries' group health plans, as such term is understood under ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(a)

113.   As fiduciaries of group health plans under ERISA, the Defendants owed participants and beneficiaries of the plans a duty of care, defined as the duty to exercise the care, skill, prudence and diligence then prevailing that a prudent person would use in the conduct of an enterprise of a like character and with like aims.  Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan. ERISA § 404(a)(1)(B) and (D), 29 U.S.C. § 1104(a)(1)(B) and (D).  By systematically engaging in the acts set forth above, the Defendants have failed to exercise care and prudence and have failed to act in accordance with the documents and instruments governing the applicable plans, thereby violating their fiduciary duty of care.

114.   As fiduciaries, the Defendants also owe participants and beneficiaries a duty of loyalty, which obligates them to make decisions solely in the interest of the participants and beneficiaries and to avoid self-dealing or financial arrangements that benefit themselves at the expense of the participants and beneficiaries under ERISA § 406, 29 U.S.C. § 1106.   The Defendants cannot, for example, make benefit determinations for the purpose of saving money at the expense of beneficiaries.

115.   By engaging in the conduct set forth above, the Defendants have violated their duty of loyalty to Plaintiff and the Class.  They have done so by making decisions to under-reimburse subscribers for medical services, treatments, and/or supplies for their own financial benefit; using the Ingenix databases as a benchmark to determine reimbursement even though the

database is flawed, unreliable and fraudulent; and failing to disclose the unreliable and biased nature of the database, and resulting reimbursement decisions, to subscribers and beneficiaries.

116.   As a result of the breaches of these fiduciary duties, Plaintiff and the Class are entitled to relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, removal of the breaching fiduciaries, and such other relief as may be available.

**Count III**
**Failure To Provide Full & Fair Review**

**Required By ERISA § 502(a)(3) 29 U.S.C. § 1132(a)(3)**

117.   Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as fully set forth herein.

118.   Chesapeake functioned and continues to function as the "plan administrator" within the meaning of such term under ERISA for Plaintiff and the Class.   During the Class Period, Plaintiff and the Class were entitled to receive a "full and fair review" of all claims denied by Chesapeake, and are entitled to assert a claim under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

119.   Although Chesapeake was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiff and the Class by, *inter alia*,   making coverage and reimbursement decisions that are inconsistent with or unauthorized by the terms of the Plans, as well as by failing to disclose data, methodologies and other critical information relating to their MAC calculations.

120.   The law and implementing regulations set forth minimum standards for claim procedures, appeals, notice to beneficiaries, and the like.   In engaging in the conduct described

herein, including use of an invalid database for calculating MACs, Chesapeake failed to comply with ERISA, its regulations and federal common law. As a result, Chesapeake failed to provide a "full and fair review," failed to provide reasonable claims procedures, and failed to make required disclosures.

121. Appeals of Plaintiff's and the Class's claims should be deemed exhausted or excused by virtue of, *inter alia*, Chesapeake's numerous and systematic procedural and substantive violations, and Insurer Defendants' failure to provide reasonable claims procedures.

122. During the Class Period, Plaintiffs and the Class have been harmed by the Chesapeake's failure to provide a "full and fair review" of appeals under ERISA § 503, 29 U.S.C. § 1133, and by the Chesapeake's failure to disclose relevant information in violation of ERISA and the federal common law. Plaintiff and the Class are entitled to statutory penalties, and injunctive and declaratory relief to remedy Chesapeake's continuing violation of these provisions.

**Count IV**
**Claim Bought Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c) for Failure To Provide An Accurate SPD and Disclosures as Required by ERISA § 102, 29 U.S.C. § 1022 and ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4)**

123. Plaintiff repeats the allegations contained in the prior paragraphs of the Complaint as if fully set forth herein.

124. Chesapeake's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health plans, known as SPD materials, under ERISA § 102, 29 U.S.C. § 1022, and supplying additional information to beneficiaries, such as Plaintiff and the Class, under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

125. Chesapeake's failure to supply accurate SPDs and requested information is redressable under ERISA § 502(c), 29 U.S.C. § 1132(c).

126.    Chesapeake's failure to disclose material information about its reimbursement rates; its use of invalid Ingenix Data; and its material changes in reimbursement policy violate ERISA, federal regulations and federal common law which obligates fiduciaries such as Chesapeake to provide such information to beneficiaries.

127.    Plaintiff and the Class have been proximately harmed by Chesapeake's failure to comply with federal regulations and the federal common law and with ERISA § 102, 29 U.S.C. § 1022 and with ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), in an amount to be determined at trial, and are also entitled to injunctive and declaratory relief to remedy Chesapeake's continuing violation of these provisions.

128.    The Plaintiffs have incurred – and continue to incur – attorney's fees and expenses in pursuing recovery for the losses they have suffered as a result of each of the foregoing wrongful acts by Defendants.  Accordingly, under section 1132(g) of ERISA, the Plaintiffs seek to recover all attorneys' fees and costs of action.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    certify the Class as set forth above, appoint named Plaintiff as representative of the Class, and appoint the undersigned Counsel as Class Counsel;

B.    enter declaratory judgment finding that Defendants have breached their obligations to the Class under ERISA and breached the terms of applicable contracts of insurance;

C.    enter preliminary and permanent injunctive relief preventing Defendants from using the Ingenix Databases, preventing Defendants from making MAC determinations in the absence of proper or reliable data substantiating the lesser amounts, and preventing Defendants from determining reimbursements based on

Maximum Allowable Charges in a manner that is inconsistent with their obligations under their certificates of coverage and Summary Plan Descriptions;

D.   enter a declaratory judgment finding that the Defendants have breached their fiduciary duties, including the duties of loyalty and care, to Plaintiff and the Class;

E.   enter a declaratory judgment finding that Defendants have failed to provide a "full and fair review" to Plaintiff and the Class under ERISA § 503, 29 U.S.C. § 1133, and awarding injunctive, declaratory and other equitable relief to Plaintiff and the Class to ensure compliance with ERISA and ERISA regulations;

F.   enter a declaratory judgment finding that Defendants have violated their disclosure obligations under ERISA and the federal common law, including under § 104(b)(4), 29 U.S.C. § 1024(b)(4) and ERISA § 102, 29 U.S.C. § 1022, for which Plaintiff and the Class are entitled to statutory penalties, injunctive, declaratory and other equitable relief;

G.   enter judgment awarding appropriate relief including civil penalties, a return of a portion of the premiums paid, award of unpaid benefits, restitution, interest, and removing Defendants as fiduciaries;

H.   enter judgment awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

I.   enter judgment awarding Plaintiff and the Class prejudgment interest; and

J.   Granting such other relief as is just and proper based on the conduct and violations of law set forth above.

  /s/ Walt D. Roper_____
Walt Roper
Texas SBN: 00786208
LAW OFFICES OF WALT D. ROPER, P.C.
3100 Monticello Ave., Suite 500
Dallas, Texas 75205
Telephone:     (972) 755-2525
Facsimile:     (214) 378-6670
walt@roperfirm.com

Stephen A. Swedlow
Illinois SBN: 6234550
KOREIN TILLERY
205 N. Michigan Avenue - Suite 1940
Chicago, Illinois  60601-4269
Telephone:     (312) 899-5064
Facsimile:     (312) 641-9555
sswedlow@koreintillery.com
*Pro Hac Vice* Admission Pending

Aaron M. Zigler
Missouri SBN: 53301
KOREIN TILLERY
One US Bank Plaza
505 N. 7th Street, Suite 3600
Saint Louis, Missouri 63101-1625
Telephone:     (314) 241-4844
Facsimile:     (314) 450-4138
azigler@koreintillery.com
*Pro Hac Vice* Admission Pending